STATE OF NORTH CAROLINA v. MARION EDWARD PEARSON, JR.

No. 541A01

(Filed 28 June 2002)

## 1. Search and Seizure— nontestimonial identification order—affidavit—reasonable grounds for suspicion

A rape defendant's motion to suppress evidence gained from a nontestimonial identification order was properly denied where the affidavit sufficiently established reasonable grounds to suspect that defendant had committed the rapes. Defendant was a suspect based on more than a minimal amount of objective justification and more than a particularized hunch.

## 2. Search and Seizure— nontestimonial identification order—supporting affidavit—reliance on information from another officer

A rape defendant failed to produce evidence that a statement in an affidavit supporting a nontestimonial identification order was made in bad faith such that it was knowingly false or in reckless disregard of the truth where the affidavit alleged that defendant had been seen peeping into an apartment but defendant argued that the report did not show that defendant was actually seen peeping. A police officer making an affidavit for issuance of a warrant may do so in reliance upon information reported to him by other officers in the performance of their duties, and the officer making the affidavit from a report in this case had every reason to conclude that defendant had been secretly peeping.

## 3. Search and Seizure— nontestimonial identification order—procedures following collection of samples

The trial court properly concluded that violations of statutory nontestimonial identification statutes were not substantial and correctly refused to suppress the seized evidence where a return was not made to the issuing judge within 90 days and defendant was not provided with a copy of the results in a timely manner. N.C.G.S. § 15A-974(2) mandates suppression when the evidence is obtained as a result of the violation, but these violations involved procedures to be followed after the samples are taken and the deviation was a mere unintentional oversight. The defense interests protected by the statutes are the requirement of an inventory of what was seized and the opportunity to move for

the destruction of that evidence, but the defendant in this case was alert during the procedure, knew what was taken, and did not move for destruction of the evidence. Finally, a subsequent search warrant obtained as the result of an SBI agent's tenacity over ten years provided more conclusive DNA and factual evidence, and it is unlikely that defendant would have avoided prosecution if this evidence was destroyed. N.C.G.S. §§ 15A-280, -282.

## 4. Search and Seizure— nontestimonial identification order—attorney not present

There was no prejudicial error in failing to provide a rape suspect with an attorney during the execution of a nontestimonial identification order where defendant moved to suppress the evidence produced by the order rather than statements made during the procedure, and, although defendant maintained that the lack of an attorney impaired his ability to obtain an order to destroy the evidence, it is clear that defendant would have remained a suspect whether or not this evidence was destroyed.

## 5. Search and Seizure— nontestimonial identification order—constitutional requirement

There was no constitutional error in the denial of a motion to suppress evidence seized with a nontestimonial identification order where the supporting affidavit provided reasonable grounds to suspect that defendant committed two rapes. Collection procedures such as these require only reasonable suspicion to be constitutionally permissible.

## 6. Search and Seizure— nontestimonial identification order—not tainted by earlier order

The trial court did not err in a rape prosecution by denying a motion to suppress a second nontestimonial identification order issued in 1998 where defendant argued that the 1998 warrant was tainted by an illegal 1986 nontestimonial identification order, but the evidence obtained in 1986 was properly seized and investigators were led back to defendant in 1998 due to the perseverance of an SBI agent rather than the results of the 1986 order, which had merely concluded that defendant was not excluded as a suspect.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 145 N.C. App. 506, 551 S.E.2d 471 (2001), finding no error in judgments entered 11 January 2000 by

Boner, J., in Superior Court, Burke County, after the trial court's 21 January 2000 order denying in pertinent part defendant's motions to suppress evidence. Heard in the Supreme Court 13 February 2002.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Robert C. Ervin for defendant-appellant.*

WAINWRIGHT, Justice.

On 21 September 1998, Marion Edward Pearson (defendant) was indicted for four counts of first-degree rape, two counts of first-degree sexual offense, two counts of first-degree burglary, and one count of robbery with a dangerous weapon. On 12 April 1999, defendant was also indicted for additional counts of first-degree rape, first-degree burglary, and robbery with a dangerous weapon.

On 11 January 2000, defendant tendered an *Alford* plea to two counts of second-degree rape as part of a plea agreement. Defendant reserved the right to appeal from the trial court's denial of his motions to suppress, and the State dismissed the remaining charges. The trial court sentenced defendant to consecutive prison terms of twenty-five years. The Court of Appeals, with one judge dissenting, found no error. Defendant appeals to this Court from the decision of the Court of Appeals on the basis of the dissent.

Our review of the record reveals the following relevant facts: On 7 March 1985, the Morganton Police Department received a report of a Peeping Tom in the Village Creek Apartments complex. When Lieutenant James Buchanan responded to the call, he saw a black male wearing a light gray or blue windbreaker and blue jeans, squatting beside an air-conditioning unit directly behind an apartment building. The suspect ran when he saw Buchanan. Buchanan lost the suspect and notified other officers to stop two cars that were leaving the complex. Defendant was driving one of the cars and was wearing a light blue windbreaker and blue jeans. When interviewed later about this incident, defendant claimed he was going to a friend's apartment in the complex, but he could not remember the friend's name.

At 1:15 a.m. on 14 July 1985, Kathy Richards reported to the Morganton Police that while she was asleep on her couch a man entered her apartment, held a knife to her throat, and raped her. Richards had been asleep on her couch when she was attacked. The

man also took thirty-eight dollars from her wallet. Richards could not see the man but believed he was a twenty-five to thirty-five-year-old white male who was over six feet tall. Police found the screen to Richards' bathroom window had been partially removed, and it appeared someone had crawled through the window. The State Bureau of Investigation (SBI) obtained from the apartment a partial Negroid hair that was not suitable for scientific comparison. A sexual assault examination was completed on Richards at the hospital.

At 1:10 a.m. on 23 November 1985, Arlene Holden called the Morganton Police and reported that a man broke into her apartment at Village Creek Apartments, disabled the lights in her bedroom, hid in her bedroom, and raped her. Before raping Holden, the man struck her in the head, tied her up with pantyhose, and covered her face, using pinking shears to threaten her. The man performed oral sex on Holden and raped her twice. After raping Holden the first time, the man made sure her face was covered, turned on the lights, and looked for money. Holden described the man as having a dark complexion and being five feet eight inches tall, with a lean or medium build. The screen had been removed from an unlocked window in Holden's bedroom. Negroid pubic and body hairs were found in trace evidence examined by the state crime lab. A sexual assault examination was done on Holden at the hospital.

Investigators developed defendant as a suspect in the Holden rape at the Village Creek Apartments based on the Peeping Tom incident in March 1985 at the apartment complex. Investigators interviewed defendant on 26 November 1985. Defendant denied any involvement in the Holden rape and left the interview with a cooperative attitude.

Between 11:30 and 11:40 p.m. on 17 February 1986, Ernestine Kyes was attacked in her bedroom. After showering, Kyes attempted to turn on her bedroom light, but it would not work. Kyes' attacker threatened her with something that felt like a knife, covered her head with a towel, performed oral sex on her, forced her to perform oral sex on him, and then raped her. The attacker took approximately forty dollars from Kyes' purse and then raped her again. The man knew the names of Kyes' children and where they went to school. Defendant's son attended the day care that Kyes directed, and defendant sometimes brought his son to and from the day care. Kyes described her attacker as a black man between five feet eight inches and five feet ten inches tall, with an average build. Evidence found on Kyes' clothing and bed covers included Negroid hairs. A sexual

assault examination was completed on Kyes at the hospital. Pubic combings of the victim contained two Negroid hairs.

Both Holden and Kyes described their attacker as someone of medium height. Holden said he was five feet eight inches tall, and Kyes said he was between five feet eight and five feet ten inches tall. Additionally, Holden and Kyes said he was of medium build. Holden said he had a lean, medium build, and Kyes described him as having an average build. Further, both women described their attacker as dark-skinned. Holden described her attacker as having a dark complexion, and Kyes said her attacker was a black male. At the scenes of both the Holden and Kyes rapes, Negroid hairs were found. Defendant is a black male, slender and muscular, and stands approximately five feet eight inches tall.

After the report of Kyes' rape, investigators intensified the focus of the investigation on defendant. At 1:30 a.m. on 18 February 1986, after learning of the Kyes rape, SBI Agent John Suttle drove directly to defendant's house and noted that the hood of defendant's car was warmer than others in the lot, as if it had been recently driven. Police interviewed defendant again on 18 February 1986. Defendant claimed he did not leave home after 11:00 p.m. on the night of this rape, 17 February 1986.

On 28 March 1986, Agent Suttle completed an application for a nontestimonial identification order (NIO) to get head and pubic hair samples, a blood sample, and a saliva sample from defendant. In his affidavit, Agent Suttle stated:

> During the early hours of 11-23-86, a white female [Holden] age 26, living at Village Creek Apartments was raped twice by a male subject that entered her apartment via an unlocked window. The subject was described by the victim as being approx. 5'8" tall, lean medium build with a dark complexion speaking with a fake accent. On the night of 2-17-86, a white female [Kyes] age 34, living at Woodbridge Apts was raped twice by a male subject that had entered her apartment via an unlocked window. The victim described her assailant as being 5'8" to 5'10", medium build, "not light and not heavy". Two [N]egroid pubic hairs were found at the scene of the second rape.
>
> . . . .
>
> . . . Marion Pearson [defendant] is a black male, slender and muscular, approx. 5'8" tall. Pearson was caught by Lt. James

Buchanan secretly peeping into apartments at Village Creek Apartments on March 7, 1985 around 9:00 pm.

Later that day, Judge Claude Sitton signed an NIO requiring defendant to appear at the Morganton Police Department on 8 April 1986 and submit to the nontestimonial identification procedures. The order was served on defendant on 1 April 1986. At the time the order was served, defendant was "belligerent and antagonistic" and refused to sign and acknowledge his receipt of the order. Defendant testified on *voir dire* at a motions hearing that he went to the office of the Clerk of Superior Court to request appointment of counsel and was told that no attorney could be appointed until he was charged with a crime.

On 8 April 1986, defendant went to the Morganton Police Department. Defendant testified he asked for an attorney again at this time but was not given one. Pursuant to the NIO, head and pubic hair samples, a saliva sample, and a blood sample were taken from defendant. Subsequent testing of the evidence showed that defendant's blood type would not be detectible from the semen left by the rapist. The testing also showed that a pubic hair found on victim Holden's sweater had similarities and dissimilarities to defendant's hairs and that two pubic hairs found on victim Kyes were microscopically consistent with defendant's hairs and could have come from him. Defendant was therefore not excluded as a suspect.

On 15 May 1986, after crawling into an occupied women's rest room stall in Morganton, defendant was arrested and sentenced to two years in prison for secret peeping. Defendant was arrested in June 1991 for a Peeping Tom offense in Maryland. Defendant was subsequently arrested in Maryland five more times for secret peeping offenses.

In March 1998, when DNA technology became available, Agent Suttle submitted to SBI Agent Brenda Bissette the sexual assault kits from victims Holden and Kyes and the samples taken from defendant pursuant to the 1986 NIO. Agent Bissette, a DNA analyst in the Molecular Genetics Section of the SBI, determined that defendant's DNA was present in both the Kyes kit and the Holden kit and concluded that only one African-American in 34 million would have the same DNA match found in the Holden kit. Bissette also said that a new blood sample from defendant could produce more definitive results.

On 23 November 1998, Agent Suttle was granted a search warrant to obtain a new blood sample from defendant. The warrant application was based on all the information concerning the crimes, including Agent Suttle's notation that defendant's car felt warm to the touch immediately after the Kyes rape was reported, defendant's arrest and conviction for entering an occupied rest room on 15 May 1986, the results of the DNA analysis of the samples obtained in 1986, and other information including defendant's multiple arrests for Peeping Tom offenses in Maryland. The search warrant was issued and served on defendant. SBI tests on the new blood revealed more definitive results identifying defendant as the perpetrator. From the new blood sample, Agent Bissette determined that only one African-American in 280 million would have the same DNA match found in both the Holden kit and the Richards kit.

[1] After his indictment, defendant filed three separate motions to suppress on 6 January 2000. Defendant first argues the trial court erred by denying his motion to suppress evidence based on violations of the nontestimonial identification statutes. He argues that Agent Suttle's affidavit submitted in support of the application for the 1986 NIO did not set forth sufficient facts to establish reasonable grounds to suspect that defendant committed the offenses.

N.C.G.S § 15A-273 provides that a nontestimonial identification order

may issue only on an affidavit . . . sworn to before the judge and establishing the following grounds for the order:

(1) That there is probable cause to believe that a felony offense . . . has been committed;

(2) That there are reasonable grounds to suspect that the person named or described in the affidavit committed the offense; and

(3) That the results . . . will be of material aid in determining whether the person named in the affidavit committed the offense.

N.C.G.S § 15A-273 (1999).

The reasonable grounds standard is similar to the reasonable suspicion standard applied to brief detentions. *See Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889 (1968). The sole requirement is a minimal amount of objective justification, something more than an

"unparticularized suspicion or 'hunch.' " *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989) (quoting *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909); *accord State v. Watkins*, 337 N.C. 437, 442, 446 S.E.2d 67, 70 (1994). The reasonable grounds standard required for an NIO is significantly lower than a probable cause standard. *State v. Grooms*, 353 N.C. 50, 73, 540 S.E.2d 713, 728 (2000), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 54 (2001). An NIO "is an investigative tool requiring a lower standard of suspicion that is available for the limited purpose of identifying the perpetrator of a crime." *Id.*

Here, it was reasonable to infer that defendant was someone who met the physical description of the perpetrator given by two of the rape victims. Further, the following facts provide reasonable suspicion that defendant committed the rapes: a Peeping Tom was reported at the location of one of the rapes; a police officer spotted a man squatting next to an air-conditioning unit directly behind an apartment building wearing a light gray or blue windbreaker and blue jeans; the man ran when he saw the officer; shortly thereafter, defendant was stopped near the location where the Peeping Tom was spotted; and defendant was wearing blue jeans and a light blue windbreaker at the time. Defendant was a suspect based on more than a minimal amount of objective justification and more than an unparticularized hunch. The affidavit sufficiently established reasonable grounds to suspect defendant committed the rapes.

[2] Defendant further argues the second sentence in the paragraph of Agent Suttle's affidavit that contains the facts establishing reasonable grounds is false and was made intentionally or with a reckless disregard for its truth. That sentence reads: "Pearson was caught by Lt. James Buchanan secretly peeping into apartments at Village Creek Apartments on March 7, 1985 around 9:00 pm." Defendant argues the police report of the incident did not show that the suspect was seen peeping into apartments, but rather that he was seen "squatting next to a[n] air conditioner unit."

As with an affidavit to procure a search warrant, evidence obtained from an NIO should be suppressed if it is the product of an affidavit that contains deliberate falsehoods or shows a reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154, 155-56, 57 L. Ed. 2d 667, 672 (1978) (holding that where a defendant shows that a search warrant affidavit includes false statements necessary to the finding of probable cause, the search warrant is void). Because "[t]here is a presumption of validity with respect to [an] affidavit supporting [a] search warrant," *State v. Fernandez*, 346 N.C. 1, 14, 484

S.E.2d 350, 358 (1997), there must also be a presumption of validity with respect to an affidavit supporting an NIO. A defendant contesting an NIO has the burden of presenting evidence to "establish facts from which the finder of fact might conclude that the affiant alleged the facts in bad faith." *Id.*

There is no evidence in the record that Agent Suttle intentionally misstated a fact to deceive anyone. Police had received a report that a Peeping Tom was at an apartment complex, a man was seen squatting next to an air-conditioning unit directly behind an apartment building, and the man ran when approached by a police officer. Police stopped defendant as he was leaving the complex, and defendant matched the description of the man seen behind the apartments. Agent Suttle had every reason to conclude defendant had been secretly peeping. He did not misrepresent the activity seen behind the apartments.

"[A] police officer making the affidavit for issuance of a warrant may do so in reliance upon information reported to him by other officers in the performance of their duties." *State v. Harvey*, 281 N.C. 1, 8, 187 S.E.2d 706, 711 (1972).

Here, Agent Suttle testified that he did not have personal knowledge of these events but that he had reviewed the report of the investigation and had talked with Lt. Buchanan and other officers who were familiar with the incident. Agent Suttle further testified that "in retrospect, [he] should have worded [the affidavit] to explain in greater length the circumstances." The trial court found that "[t]he affidavit statement that '*Pearson was caught by Lt. James Buchanan secretly peeping into apartments*' is an opinion reasonably drawn from the facts stated in Lt. Buchanan's incident report." Defendant failed to produce evidence that Agent Suttle made his allegations in bad faith such that they were knowingly false or in reckless disregard of the truth. The trial court correctly issued the NIO.

[3] Defendant also argues that N.C.G.S. §§ 15A-280 and -282 were substantially violated as defined by N.C.G.S. § 15A-974(2), which requires that evidence must be suppressed if "[i]t is obtained as a result of a *substantial* violation of the provisions of this Chapter." N.C.G.S. § 15A-280 provides:

> Within 90 days after the nontestimonial identification procedure, a return must be made to the judge who issued the order or to a judge designated in the order setting forth an inventory of

the products of the nontestimonial identification procedures obtained from the person named in the affidavit. If, at the time of the return, probable cause does not exist to believe that the person has committed the offense named in the affidavit or any other offense, the person named in the affidavit is entitled to move that the authorized judge issue an order directing that the products and reports of the nontestimonial identification procedures, and all copies thereof, be destroyed. The motion must, except for good cause shown, be granted.

N.C.G.S. § 15A-280 (1999).

N.C.G.S. § 15A-282 provides:

A person who has been the subject of nontestimonial identification procedures or his attorney must be provided with a copy of any reports of test results as soon as the reports are available.

N.C.G.S. § 15A-282 (1999).

The trial court concluded that "[t]he failure of Agent Suttle to return the non-testimonial identification order to [the trial judge] within ninety days . . . violated the provisions of G.S. 15A-280" and that "[t]he failure of Agent Suttle to provide the defendant a copy of the results of the test performed in 1986 . . . in a timely manner violated the requirements of G.S. 15A-282." The trial court further concluded that both of these violations were not substantial under N.C.G.S § 15A-974(2). We agree.

N.C.G.S. § 15A-974(2) provides that evidence must be suppressed if

[i]t is obtained as a result of a *substantial* violation of the provisions of this Chapter. In determining whether a violation is substantial, the court must consider all the circumstances, including:

a. The importance of the particular interest violated;

b. The extent of the deviation from lawful conduct;

c. The extent to which the violation was willful;

d. The extent to which exclusion will tend to deter future violations of this Chapter.

N.C.G.S. § 15A-974(2) (1999) (emphasis added).

When making a motion to suppress evidence upon a ground specified in N.C.G.S. § 15A-974, a "defendant has the burden of establishing that his motion to suppress is timely and proper in form." *State v. Satterfield*, 300 N.C. 621, 624-25, 268 S.E.2d 510, 513-14 (1980). Further, defendant "bears the burden of presenting facts in support of his motion to suppress." *Id.* at 626, 268 S.E.2d at 514.

The statute mandates that evidence must be suppressed if it is obtained as a *result* of a violation, meaning that "a causal relationship must exist between the violation and the acquisition of the evidence sought to be suppressed." *State v. Richardson*, 295 N.C. 309, 322, 245 S.E.2d 754, 763 (1978). "[E]vidence will not be suppressed unless it has been obtained *as a consequence* of the officer's unlawful conduct . . . . The evidence must be such that it would not have been obtained *but for* the unlawful conduct of the investigating officer." *Id.* at 323, 245 S.E.2d at 763.

Here, the collection of the evidence obtained from the 1986 NIO was not causally related to the statutory violations of N.C.G.S. §§ 15A-280 and .-282 because §§ 15A-280 and -282 focus on policies to be followed *after* samples are taken. These policies are not related to *obtaining* the samples.

Further, examination of the first three statutory circumstances outlined in N.C.G.S. § 15A-974(2) shows the evidence was not obtained in substantial violation of chapter 15A. Regarding the particular interest violated, N.C.G.S. § 15A-280's purposes are twofold: (1) it requires a return to the judge who issued the NIO setting forth a product inventory, and (2) it allows the subject of the NIO the opportunity to make a motion to have the NIO products destroyed. N.C.G.S. § 15A-280. In the case at bar, only insignificant interests were violated by Agent Suttle's failure to provide a return to the judge. Defendant was present at his NIO procedure and was aware of what was taken. Further, defendant had no right to the destruction of the material, but only the right to move for its destruction after the ninety day period if there was not probable cause to believe he committed the offenses. Upon hearing such a motion, the trial court could have denied the request upon a finding of good cause. Defendant failed to move for the destruction of the NIO products. Because defendant failed to move for destruction of the evidence (as discussed below), he cannot now show that the judge would have granted such a motion because he was not excluded as a suspect. Thus, defendant cannot show a significant interest was violated.

Next, the extent of the deviation from lawful conduct here was minimal. Agent Suttle's failure to provide the trial court with an inventory of what products were taken at the NIO procedure was a mere oversight, causing no prejudice to defendant. As noted above, defendant was alert at the procedure and aware of what was taken from him.

Regarding the willfulness of the violation of N.C.G.S. § 15A-280, Agent Suttle testified that he was not aware of the requirement of that subsection. Agent Suttle stated, "if I had any knowledge that a return was to be made, I would have. I've never had a judge or a District Attorney . . . say that—after ninety days a report and return has to be filed to the issuing judge." Based on our conclusions concerning these first three statutory factors, we find no substantial statutory violation.

Similarly, turning to the violation of N.C.G.S. § 15A-282, which mandates that a copy of any reports of results from NIO procedures be made available to the subject of an NIO, the same analysis given to N.C.G.S. § 15A-280 applies. The interest protected was insignificant because the samples had already been taken and the deviation was an unintentional oversight. Accordingly, N.C.G.S. § 15A-282 was not substantially violated. Further, defendant specifically contends that "[t]he violations of [these statutes] directly affected Pearson's ability to move for destruction of the samples and the test results" and that the "destruction of these test results and the samples would have eliminated the State's identification evidence in this case and ended the potential for prosecution." Based on our thorough review of the record in this case, we conclude that defendant's contentions are without merit because any statutory violation was insignificant and non prejudicial.

Agent Suttle testified that he "called [the supervisor of the DNA section] maybe every year or every two or three years and I even was to the point of putting it on my next year[']s calendar to call to check to see if they felt like the technology was there" to further test evidence obtained as a result of the NIO and from the sexual assault kits. Eventually, in 1998, the kits were resubmitted.

In all likelihood, Agent Suttle would have kept defendant as a suspect for over ten years regardless of the maintenance of the NIO products and would have obtained the 1998 search warrant regardless of the 1986 NIO. The products of the 1986 NIO procedures did not affirmatively pinpoint defendant as the perpetrator, nor did they

exclude him as a suspect. The 1998 search warrant provided more conclusive DNA and factual evidence, and this evidence was obtained as a result of Agent Suttle's determination and tenacity.

In sum, while obtaining the evidence violated chapter 15A, the violation was not substantial, and therefore the evidence was not inadmissible under N.C.G.S. § 15A-974(2). Moreover, the statutory violations were not unfairly prejudicial as defendant would have been maintained as a suspect even if the 1986 NIO evidence had been destroyed. Further, there is very little likelihood defendant would not have been prosecuted even if the 1986 NIO evidence had been destroyed. Defendant's argument is without merit.

**[4]** Next, defendant argues that the failure to provide him an attorney was a substantial violation of N.C.G.S. § 15A-279(d), which provides that a defendant

> is entitled to have counsel present and must be advised prior to being subjected to any nontestimonial identification procedures of his right to have counsel present during any nontestimonial identification procedure and to the appointment of counsel if he cannot afford to retain counsel. No statement made during nontestimonial identification procedures by the subject of the procedures shall be admissible in any criminal proceeding against him, unless his counsel was present at the time the statement was made.

N.C.G.S. § 15A-279(d) (1999).

On 26 March 1986, during an interview with police officer Ronnie Hudson, defendant told Hudson that he had been "screwed" by the police enough and that he thought it was time he get an attorney. Defendant testified that after being served with the NIO in April 1986, he

> came down here to the courthouse and went to the front window and told them that I wanted to apply for a court-appointed lawyer and they sent me to a room off to the side. . . . I don't know who it was but that's the—I went to the office that they sent me to and requested for an attorney and the person behind the desk said basically that if you're—if this makes it to court, then we can assign you a lawyer and I said, well, you know, it says here I have a right to an attorney and they said, well, yeah, but this office can't issue a lawyer unless you have a trial—I mean unless you have a case here and so I went to—I believe it was upstairs to a

judge's chambers and asked and basically the notion I got was that I couldn't get one until I was—you know, I was arrested on a crime or something.

Defendant further testified that he called the ACLU to request a lawyer and asked his father for help getting a lawyer. Defendant testified that at the NIO procedure, Agent Suttle said defendant would be provided an attorney, but that Agent Suttle later said no attorney was available. Defendant claimed that he then underlined a form where it said that he had a right to an attorney.

Agent Suttle testified that he did not recall defendant requesting an attorney. Agent Suttle said that if defendant had asked for an attorney, "I would have stopped and we[] [would have] made arrangements to get him a lawyer. . . . [we would have] had to call the Clerk's office to get him a lawyer appointed." Agent Suttle said, "he [defendant] obviously was not saying he wanted a lawyer because, if he had, I would have gotten him one." In addition, after a review of the record, we find no form that contains underlining as defendant claimed. Defendant was not provided an attorney, and the NIO procedures were performed without an attorney present.

The trial court concluded that this was a substantial violation of the statute but that defendant was "not entitled to suppression of the physical evidence seized from him because the evidence was not obtained as a result of the violation. The physical evidence would have been seized from the defendant even if counsel had been present since it was being obtained pursuant to a court order." We agree.

The transcript and records contain conflicting information as to what defendant specifically requested, how and to whom he articulated such requests, and when such requests were made. By calling the ACLU, approaching his father for help to get an attorney, and telling Officer Hudson that he thought it was time he get an attorney, defendant appeared to be getting his own attorney. However, assuming, *arguendo*, that defendant's account of his requests for an attorney is accurate, he fails to demonstrate how the presence of counsel when the evidence was taken would have further protected his rights, and we hold that the failure to provide an attorney, while error, was not prejudicial.

"[A]ccording to the plain language of section 15A-279(d), the provision protects the defendant from having statements made during

the nontestimonial identification procedure used against [him] at trial where counsel was not present during the procedure." *State v. Coplen,* 138 N.C. App. 48, 58, 530 S.E.2d 313, 320, *cert. denied,* 352 N.C. 677, 545 S.E.2d 438 (2000). Here, defendant did not seek to suppress any statements made during the procedure, only to suppress the actual evidence procured.

Defendant also argues that the failure to provide him an attorney impaired his ability to obtain an order for the destruction of the evidence, which meant the SBI could preserve the evidence and later test it with more sophisticated DNA technology. We disagree. Whether defendant had an attorney to advise him to seek to have the evidence destroyed is not determinative. Based on a plethora of evidence other than the products of the 1986 NIO, Agent Suttle and the SBI would have had probable cause to obtain the 1998 search warrant. In the application for the 1998 search warrant, in addition to the details of the three rapes and the investigations, Agent Suttle outlined the following evidence in a seven page affidavit:

After Pearson was released from the North Carolina Department of Corrections, Investigators did not have any contact or knowledge of Pearson being in the Morganton area. There have not been any other similar reported burglary/rapes reported in the Morganton area since the February rape of Victim Kyes in 1986 and the intense focusing by investigators on Pearson as a suspect.

This affiant in 1993 upon reviewing the serial rapes that occurred in Morganton located through various sources Marion E. Pearson, Jr. in Landham, Maryland. S/A Suttle contacted a Sergeant Paul Evans of the Sex Crimes Unit for Prince Georges County Police in February of 1993 to determine if they were having any burglary/rapes with a similar modus operandi. Evans indicated they had not. A local record check then of Pearson revealed Pearson was arrested on February 28, 1980 for a peeping tom offense and again for the same offense on June 28, 1991 in Maryland. The record also revealed parking citations issued to Pearson in 1991 at the University of Maryland.

Affiant recontacted the Sex Crimes Unit of Prince Georges County Police on October 14, 1997 to review Pearson's status in Maryland. Affiant also had [] been communicating with the Molecular Genetics Division of the North Carolina Crime Lab for several years with the intentions of waiting for DNA technology

to improve before reinitiating some contact with Marion E. Pearson, Jr.

Affiant talked with Investigator Candice Santos on October 14, 1997 and learned she has two similar unsolved burglary/rapes that she is working on without any suspects. She noted the suspect in both cases did not leave any DNA evidence behind by using a condom and or ejaculating on something that he took from the crime scene with him.

An updated check of Pearson's record in Maryland revealed he had been arrested five times for "peeping tom" related offenses since his record was examined in 1993 by Sergeant Evans and S/A Suttle.

This affiant upon reviewing and examining the three Morganton rape cases notes the following similarities and conclusions:

1. All three Morganton rapes were committed by the same suspect because of the similarities of the three crimes: time, fake accent, Negroid hairs, disabled bedroom lights in the last two cases, moistening of the vagina before first sex act by performing cunninglingus [sic], second rape of second and third victims from behind, taking of money from all three victims, close proximity to town permitting suspect to get away before being caught, use of an edged weapon to gain control of victim.

2. The FBI Behavioral Science Unit review of the cases concluded in all probability that the same suspect committed all three rapes.

3. Marion Pearson's connection to the Village Creek Apartments and his unusual activity there near where the second victim lived.

4. The contact Pearson had with the third victim at the daycare and his ability to surveil victim Kyes and learn her address and facts about her single parent family.

5. Pearson's lack of cooperativeness after the investigation focused on him.

6. Pearson's bizarre behavior such as the bathroom incident at the college which resulted in his getting two years in prison.

7. Pearson's continued bizarre nighttime activity in Maryland where he had been charged with peeping tom offenses twice prior to 1993 and his being arrested five times since 1993 in the Maryland area for similar offenses.

8. All three victims were assaulted in the privacy of their own home [sic] and approached from behind by an assailant that entered through unlocked windows. All victims lived in apartments.

9. All three [victims] maintained quiet lifestyles, all were divorced and none of them had promiscuous tendencies or careless attitudes that would classify them at a high risk as a victim of a violent crime.

10. In all three cases the suspect maintained control over the victims by verbalizing continued threats.

It is this affiant's professional opinion based on years of training and dealing with criminal activity and criminal minds that the so called "peeping tom" activity of Marion Pearson is the proverbial "tip of the iceberg". With the multiple arrests for "peeping" related offenses, common sense would lead a reasonable person to conclude he had to be committing the act many more times than he was caught at. No reasonable person would believe that he was apprehended by police every time he committed the act.

In furtherance of this opinion, this suspect is not out being a "peeping tom" for voyeuristic pleasures but he is stalking his unwitting victims many of whom would never report their rape for fear of the embarrassment and life complications reporting same would involve. If the suspect committing these rapes would beat, injure or maim the external body of the victim's [sic] they would be forced to report these violations. This suspect committing these crimes is smart enough to know if he does not hurt his victims physically they in a high probability might not report the incident. Marion Pearson is a very intelligent individual with collegiate level education and has represented himself in court before. Pearson is also educated to the point of being able to research the "information age" to learn about how DNA is used in forensic labs to identify rapists and how to easily avoid leaving that evidence behind in or on a victim.

This affiant based on many years of experience has the opinion that "[p]eeping tom" activity is not necessarily behavior

STATE v. PEARSON

[356 N.C. 22 (2002)]

always consistent with voyeurism. This is a method of selection and evaluation process for a serial rapist to select his victims. In this investigation a suspect in three rapes in a small town in North Carolina is eight years later actively searching and stalking future victims in the State of Maryland.

Although it was error to deny defendant counsel at the NIO procedure, such error was not prejudicial under these circumstances. After a thorough review of the record, it is clear that defendant would have remained a suspect in this case whether the evidence from the 1986 NIO was destroyed or not.

"The test for prejudicial error is whether there is a reasonable possibility that the evidence complained of contributed to the conviction." *State v. Milby*, 302 N.C. 137, 142, 273 S.E.2d 716, 720 (1981). In view of the overwhelming evidence that Agent Suttle and investigators accumulated, as well as Agent Suttle's perseverance in maintaining defendant as a suspect until DNA testing evolved, we conclude there is no reasonable possibility that the result here was affected by the failure to provide defendant counsel at the NIO procedure.

[5] In his next argument, defendant contends the trial court committed constitutional error in denying his motion to suppress evidence obtained from the NIO. Specifically, defendant argues the affidavit used to obtain the NIO failed to provide reasonable grounds for suspicion and relied on false and misleading information. We have already addressed these arguments in the statutory setting, and the result is the same under a constitutional analysis. This argument is without merit.

Collection procedures like those involved in the present case require only reasonable suspicion to be constitutionally permissible. *See Hayes v. Florida*, 470 U.S. 811, 817, 84 L. Ed. 2d 705, 711 (1985) (holding that "[t]here is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act"). As established above, the affidavit in the present case supporting the NIO application established reasonable grounds to suspect that defendant committed the Holden and Kyes rapes. Further, as also discussed above, defendant fails to provide sufficient evidence that the affidavit relied on false or misleading information.

**[6]** In his final argument, defendant contends the trial court erred by denying his motion to suppress a blood sample obtained as a result of the 23 November 1998 search warrant as well as DNA testing of that blood sample. According to defendant, Agent Suttle's decision to seek the search warrant in 1998 was prompted by testing on evidence illegally obtained in 1986. Moreover, results of the tests done on this illegally obtained evidence were presented to the judge who issued the 1998 search warrant. Thus, defendant contends the evidence obtained via the 1998 search warrant was fruit of the poisonous tree because the search warrant was tainted by the illegality of the 1986 NIO.

As previously discussed, it is apparent from the record that Agent Suttle persevered in maintaining defendant as a suspect for over ten years until DNA testing was more advanced. It was this perseverance rather than the results of the 1986 NIO that led investigators back to defendant. In short, because the evidence obtained in 1986 was properly seized, the evidence obtained in 1998 could not be tainted by the 1986 evidence, especially when viewed in light of the abundant evidence obtained prior to the procurement of the 1998 search warrant. Accordingly, defendant's argument is without merit.

In conclusion, we conclude that the trial court committed no prejudicial error, and we therefore affirm the decision of the Court of Appeals.

AFFIRMED.