Affirmed in part, dismissed in part, reversed in part, and remanded by published opinion. Judge MOTZ wrote the opinion, in which Judge WILKINSON concurred and Judge GREGORY concurred except as to Parts III-B and III-B.l. Judge WILKINSON wrote a concurring opinion. Judge GREGORY wrote an opinion concurring in part and dissenting in part.
OPINION
DIANA GRIBBON MOTZ, Circuit Judge:
These appeals arise from allegations that the City of Durham and its officials mishandled false rape charges made against members of the 2005-2006 Duke University lacrosse team. The City and its officials asserted various immunities from suit and on that basis moved to dismiss, or for summary judgment, as to all claims alleged against them. The district court granted those motions in part and denied them in part. The City and its officials appeal. There is no cross-appeal. For the reasons that follow, we affirm in *642 part, dismiss in part, reverse in part, and remand for further proceedings.
I.
Three groups of plaintiffs brought these cases. We set forth the relevant facts as alleged in their amended complaints. Although the complaints are not identical, they differ only minimally. We note all relevant differences.
A.
According to the amended complaints, on the evening of March 13-14, 2006, many members of the Duke lacrosse team attended a party at the Durham, North Carolina home of team co-captains David Evans, Daniel Flannery, and Matthew Zash. One of the hosts had hired two exotic dancers, Crystal Mangum and Kim Pittman, to perform at the party. Mangum (who appeared to be intoxicated) and Pittman performed only briefly from midnight to 12:04. Approximately forty minutes later, the two women left the party together in Pittman’s car.
After leaving the party, Mangum became belligerent and accused Pittman of stealing her money. Pittman pulled into a grocery store parking lot and asked a nearby security guard for assistance in removing Mangum from her car. After the guard determined that Mangum in fact was intoxicated, he called Durham police. When Sergeant John Shelton arrived at the scene, Mangum feigned unconsciousness. Sergeant Shelton instructed another officer to take Mangum to the Durham Access Center, an outpatient mental health clinic with a mandatory twenty-four hour observation period for involuntarily admitted patients. During her intake interview, Mangum asserted that she had been raped by nodding “yes” to the question “Were you raped?” Because of her allegation, Mangum was transported to the Duke Medical Center for a sexual assault examination.
At the Duke Medical Center, Sergeant Shelton questioned Mangum regarding her rape allegations. Mangum then denied being raped, but contended that someone had stolen her money. Soon after this recantation, Mangum told another officer she had been raped by as many as five men after performing at a bachelor party. Over the course of that night and the next few days, Mangum provided multiple, vastly inconsistent versions of her rape to medical personnel and police officers. Her accounts differed not only as to how many men had raped her (ranging from three to twenty), but also as to how they raped her (orally, vaginally, or anally).
Nurses at the Duke Medical Center performed a rape kit examination to document physical evidence of sexual assault. Some plaintiffs allege that Nurse Tara Levicy interviewed Mangum, who told the nurse that three white men — named Adam, Bret, and Matt — had raped her orally, vaginally, and anally, had not worn condoms, and had ejaculated in her mouth, vagina, and anus. A doctor performed a pelvic examination on Mangum and noted only one abnormality — diffuse edema of the vaginal walls— which Nurse Levicy then recorded on a sexual assault examination report.
Officer B.S. Jones, who was initially assigned to investigate Mangum’s allegations, believed that no evidence supported proceeding with a criminal investigation. Nonetheless, during the next two days (March 15-16), the case was reassigned to Officers Mark Gottlieb and Benjamin Hi-man. When Officers Gottlieb and Himan interviewed Mangum for the first time on March 16, Mangum told them that she was raped by three white men — Adam, Bret, and Matt — and provided physical descriptions of the attackers. Later that day, *643 based on her descriptions, Durham Police administered a photo array to Mangum limited to pictures of twenty-four white members of the Duke lacrosse team. Mangum did not identify any of the men in the photographs as her attackers, though she did identify men who she believed had attended the party.
On the same day, March 16, Officers Gottlieb and Himan executed a search warrant for the site of the March 13-14 party. The three residents — Evans, Flan-nery, and Zash — complied with the execution of the search warrant, consented to lengthy police interviews, submitted to physical inspections for signs of rape, and provided DNA and hair samples.
Four days later, on Monday, March 20, Officer Himan interviewed Mangum’s fellow dancer, Pittman, who asserted that Mangum’s rape allegations were a “crock” and that there had been no opportunity for an assault to have occurred out of Pittman’s presence at the party. On March 22, Officers Gottlieb and Himan used an outstanding arrest warrant and the threat of revocation of probation to induce Pittman to recant her initial statement calling the rape allegations a “crock,” and to create a fictional window of opportunity in her story when the rape could have been committed. In the meantime, Durham Police arranged a second photo array of members of the Duke lacrosse team. Once again, Mangum could not identify any attacker.
During this same time period, Officer Gottlieb served a subpoena on Nurse Levi-cy to obtain the Medical Center’s sexual assault examination report. Some plaintiffs allege that Nurse Levicy previously had indicated to Officer Gottlieb that the examination of Mangum had revealed “signs consistent with sexual assault,” but had refused to turn over the report without a subpoena. Once Officer Gottlieb returned with the subpoena, Nurse Levicy misled Gottlieb about the extent of the evidence of sexual assault, claiming that the examination had also revealed physical evidence of “blunt force trauma” and other symptoms “consistent with the victim’s statement.”
Two days later, on Thursday, March 23, Officers Gottlieb and Himan, using Nurse Levicy’s corroborating statements, obtained court approval for a non-testimonial order (“NTO”). The NTO required the forty-six white lacrosse team members to provide DNA samples, sit for photographs, and submit to examination for injuries consistent with struggle during a sexual assault. The police offered two affidavits in support of the NTO — one to establish probable cause that a crime had been committed, the other to establish reasonable grounds that the subjects might have committed the crime. The NTO affidavits explained that “[t]he DNA evidence requested will immediately rule out any innocent persons, and show conclusive evidence as to who the suspect(s) are in the alleged violent attack upon this victim.” The team members fully complied with the NTO.
B.
The next day, Friday, March 24 (ten days after the alleged rape), District Attorney Michael Nifong took over the investigation. Durham Police Commander Jeff Lamb instructed Officers Gottlieb and Hi-man to take direction in the rape investigation from Nifong.
On Monday morning, March 27, Officers Gottlieb and Himan briefed Nifong on the case. At this briefing, the officers detailed the exculpatory evidence, including contradictions in Mangum’s allegations and the negative results of the photo arrays. Recognizing the weakness of the case, Ni-fong responded, “You know, we’re fucked.”
*644 Nonetheless, the investigation continued. Later that morning,- Officer Gottlieb obtained from a confidential source an email that a lacrosse team member, Ryan McFa-dyen, had sent to his teammates only hours after the party at which the rape assertedly occurred. The email stated:
tomorrow night ... ive decided to have some strippers over to edens 2c. all are welcome., however there will be no nudity. i plan on killing the bitches as soon as they walk in and proceeding to cut their skin off while cumming in my duke issue spandex.... 41
McFadyen’s dormitory address was Edens 2C, and his lacrosse jersey number was 41. Officers Gottlieb and Himan added the text of the email to the information from the NTO affidavits and applied for and executed a search warrant on McFadyen’s dorm room, adding to the list of suspected crimes “conspiracy to commit murder.”
Meanwhile, on March 24 and 25, Durham police spokesperson Corporal David Addison made a series of public statements regarding the case. On March 24, Corporal Addison told local and national reporters that the investigation had produced “really, really strong physical evidence” of rape. In explaining the scope of the NTO, Corporal Addison told one reporter: “You are looking at one victim brutally raped. If that was someone else’s daughter, child, I don’t think 46 [suspects] would be a large enough number to figure out exactly who did it.” The next day, Corporal Addison stated: “We’re asking someone from the lacrosse team to step forward. We will be relentless in finding out who committed this crime.”
By March 28, the State Bureau of Investigation had concluded its examination of evidence from Mangum’s rape kit and the DNA collected from the plaintiffs under the NTO. By March 29, the State Bureau of Investigation had notified Nifong of the results: the state examination revealed no DNA from anyone in Mangum’s rape kit or her clothing. Nevertheless, Nifong sought a second, more sensitive DNA analysis at a private laboratory, DNA Security, Inc. On April 5, Nifong obtained a judicial order to transfer the rape kit and NTO evidence to the private laboratory.
Meanwhile, the day before, on April 4, Officer Gottlieb administered a third photo array to Mangum. This photo array contained pictures of all forty-six white members of the Duke lacrosse team; the police officers informed Mangum that they had reason to believe everyone pictured had been at the party. During this photo array, Mangum identified three team members as her attackers — David Evans with 90% certainty, Collin Finnerty with 100% certainty, and Reade Seligmann with 100% certainty.
From April 7 through April 10, the private laboratory analyzed the rape kit and NTO evidence. On April 10, employees from the private laboratory met with Ni-fong and Officers Gottlieb and Himan to report the results of the analyses. Although the private laboratory found that several men contributed DNA to the items in Mangum’s rape kit, the analyses excluded with 100% certainty every member of the Duke lacrosse team as a potential contributor of that DNA. Knowing that the private laboratory’s results would prevent an indictment, neither Nifong nor the officers disclosed the results to the players or their attorneys. However, the state laboratory’s initial report — finding no DNA from anyone in Mangum’s rape kit — was released to the public later that day.
Notwithstanding two negative DNA analyses, Mangum’s inconsistent testimony, and Pittman’s initial repudiation of Mangum’s allegations, Nifong continued pursuing the case. On April 17, Nifong sought and successfully obtained indict *645 ments against Collin Finnerty and Reade Seligmann for first-degree rape, first-degree sex offense, and kidnapping. On May 12, Nifong provided a report detailing the private laboratory’s DNA results to counsel for Finnerty and Seligmann. However, the report excluded the fact that the private laboratory had conclusively eliminated every member of the Duke lacrosse team as a potential contributor of the DNA found in the rape kit. Nifong, along with Officers Gottlieb and Himan, had worked with the private laboratory to ensure that the report remained ambiguous and misleading on this point. On May 15, based partly on the private laboratory’s misleading report, Nifong sought and obtained an indictment against David Evans for first-degree rape, first-degree sexual offense, and kidnapping.
Over the next few months, Nifong intentionally misrepresented and misstated material facts to opposing counsel and the state trial judge regarding the private laboratory’s DNA report. On September 22, the state judge issued an order requiring Nifong to provide the indicted lacrosse players with the complete files and underlying data from both the State and private laboratory analyses. After complying with the order, Nifong denied prior knowledge that the private laboratory test had ruled out all lacrosse team members as contributors of DNA in Mangum’s rape kit. However, on December 15, employees from the private laboratory admitted to conspiring with Nifong to obfuscate the results of its DNA analyses.
On December 21, in an interview with a Durham police officer, Mangum recanted her rape allegation for the first time since the night of the alleged rape. Mangum, however, still maintained that she had been assaulted. Nifong dismissed the charges of first degree rape, but continued the prosecutions of the sexual assault and kidnapping charges.
The North Carolina State Bar subsequently filed an ethics complaint against Nifong based on his conduct in the Man-gum rape investigation. On January 12, 2007, Nifong recused himself from the criminal cases arising from Mangum’s allegations. On April 11, after a thorough, independent review, the Attorney General of North Carolina, noting the inconsistency in Mangum’s statements, Mangum’s suspect credibility, and the DNA reports demonstrating no rape by the indicted men, dismissed the remaining charges against Evans, Finnerty, and Seligmann. On June 16, Nifong was disbarred for his conduct during the Mangum investigation and prosecution.
C.
Based on the above facts, Evans, Selig-mann, and Finnerty (collectively the “Evans plaintiffs”), Ryan McFadyen, Matthew Wilson, and Breck Archer (collectively the “McFadyen plaintiffs”), and thirty-eight other members of the 2005-2006 Duke University lacrosse team (collectively the “Carrington plaintiffs”) filed three separate complaints in the Middle District of North Carolina alleging a myriad of claims against many defendants, including the City of Durham and city officials, particularly certain police officers.[1]
*646 The individual police officers moved to dismiss all claims against them. They asserted qualified immunity from the federal claims and official immunity from the state claims. The City and its supervisory officials moved to dismiss the federal claims pled against them, arguing that those claims failed because the allegations against the officers failed. The City moved for summary judgment on the state common-law claims, asserting governmental immunity, and moved to dismiss the state constitutional claims. The district court granted these motions in part and denied them in part.
The police officers, supervisory officials, and City appeal; no plaintiff cross-appeals. We have consolidated the three cases on appeal. We address first the federal and then the state claims asserted in the three amended complaints.
II.
We have jurisdiction over the officers’ interlocutory appeals from the district court’s judgment denying their motions to dismiss the federal claims against them because the officers assert qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). “We review de novo the denial of a motion to dismiss based on qualified immunity, accepting as true the facts alleged in the complaint and viewing them in the light most favorable to the plaintiff.” Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir.2006).
Qualified immunity protects government officials from suit for damages when their conduct does not violate a “clearly established” constitutional right. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To escape dismissal of a complaint on qualified immunity grounds, a plaintiff must (1) allege a violation of a right (2) that is clearly established at the time of the violation. See Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Although we may address immunity without ruling on the existence of a right, see id. at 236, 129 S.Ct. 808, if a plaintiff fails to allege that an official has violated any right, the official “is hardly in need of any immunity and the analysis ends right then and there,” Abney v. Coe, 493 F.3d 412, 415 (4th Cir.2007).
With these principles in mind, we turn to the federal claims at issue here.
A.
The Evans plaintiffs allege a § 1983 malicious prosecution claim against Officers Gottlieb and Himan.[2] The district court denied the officers’ motions to dismiss this *647 claim, reasoning that the plaintiffs stated such a claim by alleging they “were arrested pursuant to an indictment that was obtained by the intentional or reckless creation of false or misleading evidence used before the grand jury that was necessary to a finding of probable cause, or the deliberate or reckless omission of material information that officials knew would negate probable cause.” Evans v. City of Durham, No. 1:07CV739, slip op. at 29-30 (M.D.N.C. Mar. 31, 2011).
A “malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.” Lambert v. Williams, 223 F.3d 257, 261 (4th Cir.2000). To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiffs favor. See Durham v. Homer, 690 F.3d 183, 188 (4th Cir.2012).
For purposes of this appeal, the officers do not contend that the Evans plaintiffs have failed to allege illegal seizures (ie., the indictments) or that criminal proceedings failed to terminate in the plaintiffs’ favor (ie., the dismissal of the indictments). The officers do maintain, however, that they escape liability for the assert-edly illegal seizures because they did not cause them. Rather, they contend, an independent intervening act of another — ie., Prosecutor Nifong’s decisions to seek the indictments — caused the seizures.[3]
Of course, constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation. See Murray v. Earle, 405 F.3d 278, 289-90 (5th Cir.2005); Townes v. City of New York, 176 F.3d 138, 146 (2d Cir.1999). Accordingly, subsequent acts of independent decision-makers (e.g., prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer’s misconduct and a plaintiffs unlawful seizure. See Zahrey v. Coffey, 221 F.3d 342, 351 (2d Cir.2000). Such “intervening acts of other participants in the criminal justice system” insulate a police officer from liability. Id.; see also Cuadra v. Hous. Indep. Sch. Dist., 626 F.3d 808, 813 (5th Cir.2010), cert. denied, — U.S. -, 131 S.Ct. 2972, 180 L.Ed.2d 247 (2011); Wray v. City of New York, 490 F.3d 189, 195 (2d Cir.2007); Barts v. Joyner, 865 F.2d 1187, 1195 (11th Cir.1989); Smiddy v. Varney, 665 F.2d 261, 266-68 (9th Cir.1981), overruled on other grounds by Beck v. City of Upland, 527 F.3d 853, 865 (9th Cir.2008); Rhodes v. Smithers, 939 F.Supp. 1256, 1274 (S.D.W.Va.1995), aff'd, No. 95-2837, 1996 WL 420471 (4th Cir. July 29,1996) (unpublished).
However, even when, as here, a prosecutor retains all discretion to seek an indictment,[4] police officers may be held to have caused the seizure and remain liable to a wrongfully indicted defendant under certain circumstances. In particular, officers may be liable when they have lied to or misled the prosecutor, see, e.g., Sykes v. *648 Anderson, 625 F.3d 294, 317 (6th Cir.2010); Jones v. City of Chicago, 856 F.2d 985, 993 (7th Cir.1988); Borunda v. Richmond, 885 F.2d 1384, 1390 (9th Cir.1988); failed to disclose exculpatory evidence to the prosecutor, see, e.g., Dominguez v. Hendley, 545 F.3d 585, 590 (7th Cir.2008); Sanders v. English, 950 F.2d 1152, 1159-60 (5th Cir.1992); or unduly pressured the prosecutor to seek the indictment, cf. Beck, 527 F.3d at 870.
Stated differently, a police officer is not liable for a plaintiffs unlawful seizure following indictment “in the absence of evidence that [the officer] misled or pressured the prosecution.” Wray, 490 F.3d at 195; see also Snider v. Lee, 584 F.3d 193, 206 (4th Cir.2009) (Stamp, J., concurring) (“A law enforcement officer who presents all relevant probable cause evidence to a prosecutor ... is insulated from a malicious prosecution claim where such intermediary makes an independent decision ... unless the officer [1] concealed or misrepresented facts or [2] brought such undue pressure to bear on the intermediary that the intermediary’s independent judgment was overborne.”); Hand v. Gary, 838 F.2d 1420, 1428 (5th Cir.1988) (“An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant.”).
The Evans plaintiffs do not allege that Officers Gottlieb and Himan misled or misinformed Nifong. Indeed, the Evans plaintiffs expressly allege that, from the outset, the officers candidly briefed Nifong as to the startling weaknesses in the case by “detailing] the extraordinary evidence of innocence and the fatal defects in Man-gum’s claims” and “eonvey[ing] to Nifong that Mangum was not credible.” The Evans plaintiffs nonetheless insist that the officers remain liable because they “misrepresented, withheld, or falsified evidence” that ultimately influenced the grand jury. This argument fails because acts of either the prosecutor or the grand jury may break the causal chain. Cf. Cua-dra, 626 F.3d at 813; Barts, 865 F.2d at 1195. In other words, if the independent act of a prosecutor breaks the causal chain, the fact that the prosecutor misled the grand jury does not render police officers liable.
Alternatively, the Evans plaintiffs maintain that Officers Gottlieb and Himan conspired with Nifong to fabricate and conceal evidence from the grand jury and thus somehow unduly pressured Nifong to seek the indictment. The allegations in their complaint significantly undercut this argument. For the Evans plaintiffs ground their entire case on allegations that Nifong desired to exploit the “high-profile, racially-charged rape allegation for his personal political gain.” They further allege that from his very first meeting with the officers, Nifong noted the lack of exculpatory evidence: “we’re f*eked.” Tellingly, the Evans plaintiffs do not assert that Officers Gottlieb and Himan responded by pressuring Nifong to pursue the case. Rather, they allege that the officers continued the investigation at Nifong’s instruction, and that, when Nifong sought to indict the Evans plaintiffs, Officer Himan frankly responded, “With what?” No matter how generously read, these allegations do not allege that Officers Gottlieb and Himan pressured Nifong to seek an indictment.
Moreover, it seems contrary to the very purpose of qualified immunity to extend personal liability to police officers who have assertedly conspired with, but neither misled nor unduly pressured, an independent prosecutor. Police officers and prosecutors often work together to establish probable cause and seek indictments; such collaboration could always be characterized as a “conspiracy.” Allowing § 1983 claims *649 against police officers to proceed on allegations of such a “conspiracy” would in virtually every case render the officers’ qualified immunity from suit “effectively lost,” Mitchell, 472 U.S. at 526, 105 S.Ct. 2806, and make discovery the rule, rather than the exception, see Anderson v. Creighton, 488 U.S. 635, 689^0 & n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
Thus, we hold today that an alleged officer-prosecutor conspiracy does not alter the rule that a prosecutor’s independent decision to seek an indictment breaks the causal chain unless the officer has misled or unduly pressured the prosecutor.[5] Because the Evans plaintiffs do not allege that Officers Gottlieb and Himan either misled or pressured Nifong to seek their indictments, we reverse the district court’s denial of the officers’ motions to dismiss the Evans plaintiffs’ § 1983 malicious prosecution claims against them.
B.
Both the McFadyen and Carrington plaintiffs allege § 1983 claims against Officers Gottlieb and Himan based on the officers’ asserted unlawful seizures of evidence pursuant to a state non-testimonial order (“NTO”). Plaintiffs acknowledge that in seizing physical evidence from them, the officers acted pursuant to a state NTO, but claim that those seizures nonetheless violate the Fourth Amendment because the NTO flowed from the officers’ assertedly dishonest supporting affidavits. The district court agreed and so denied the officers’ motions to dismiss these claims.
The North Carolina NTO statute requires “probable cause to believe that a felony offense ... has been committed;” “reasonable grounds to suspect that the person named or described in the affidavit committed the offense;” and “[t]hat the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense.” N.C. GemStat. § 15A-273(l)-(3).[6]
Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), *650 guides our analysis as to whether asserted material false statements and omissions in the NTO supporting affidavits offered by Officers Gottlieb and Himan state a constitutional claim. See also Miller v. Prince George’s Cnty., 475 F.3d 621, 627 (4th Cir.2007) (extending Franks to § 1983 claims). Franks provides a two-prong test. First, plaintiffs must allege that defendants “knowingly and intentionally or with a reckless disregard for the truth” either made false statements in their affidavits or omitted facts from those affidavits, thus rendering the affidavits misleading. See Franks, 438 U.S. at 155-56, 98 S.Ct. 2674; Miller, 475 F.3d at 627. Second, plaintiffs must demonstrate that those “false statements or omissions [are] ‘material,’ that is, ‘necessary to’ ” a neutral and disinterested magistrate’s authorization of the search. Miller, 475 F.3d at 628 (quoting Franks, 438 U.S. at 155-56, 98 S.Ct. 2674). We take up each prong in turn.
1.
a.
In their complaints, both the McFadyen and Carrington plaintiffs allege that Officers Gottlieb and Himan deliberately falsified their NTO affidavits by wrongly declaring that: (1) Mangum had claimed she lost painted fingernails in a struggle with her attackers, and police recovered fingernails during their search of the house where the party (and alleged rape) occurred; (2) the lacrosse team members used aliases before and during the party to conceal their identities from Mangum and Pittman; and (3) the team members attempted to conceal their university and team affiliations from Mangum and Pittman during the party. In addition, the McFadyen plaintiffs maintain that the officers deliberately falsified the affidavits by declaring that at one point during the party a male attendee, holding a broomstick in the air, told Mangum and Pittman “I’m going to shove this up you.” No record evidence lends any support for these four statements; accordingly, they clearly satisfy the first Franks prong as deliberate falsehoods.
We note that on appeal, plaintiffs vigorously contend that the officers’ reliance in the NTO affidavits on Nurse Levic/s corroborating statements constitutes another deliberately false statement under Franks. But the plaintiffs’ amended complaints belie this contention.
The McFadyen complaint does not even mention the nurse’s statements when detailing the false statements in the NTO affidavits. While the Carrington complaint does allege that the portions of the affidavits based on the nurse’s statements were false, it does not allege that the officers knew of the falsity when applying for the NTO, or acted with reckless disregard for the truth in relying on the nurse’s statements. Of course, the truthfulness of a witness statement is irrelevant as to whether affiants’ statements were truthful. See Franks, 438 U.S. at 171, 98 S.Ct. 2674. And that the officers may have learned of the falsehood of the nurse’s statements after the NTO issued does not defeat their reliance on the information when applying for the NTO. See Unus v. Kane, 565 F.3d 103, 125 (4th Cir.2009). Moreover, although the Carrington plaintiffs allege that at some point Nurse Levicy and Officers Gottlieb and Himan conspired to prolong the investigation, they do not allege when that conspiracy began. Indeed their eom- *651 plaint suggests that the officers initially believed Nurse Levic/s statements.
For these reasons, we cannot agree that the officers’ reliance on the nurse’s corroborating statements constituted a deliberate falsehood under Franks. Rather, only the four misstatements actually pled in the McFadyen plaintiffs’ complaint (three of which are also pled in the Carrington plaintiffs’ complaint) satisfy the first Franks prong.[7]
b.
In addition, the McFadyen plaintiffs allege that Officers Gottlieb and Hi-man’s omission from the NTO affidavits of the fact that in the first photo array Man-gum “ruled out as plausible suspects” several team members also satisfies the first Franks prong. We disagree. Affiants are not required to include every piece of exculpatory information in affidavits. See, e.g., Simmons v. Poe, 47 F.3d 1370, 1384 (4th Cir.1995) (finding affiant’s omission of facts inconsistent with a suspect’s guilt from an affidavit “was not an attempt to mislead the magistrate” under Franks); United States v. Colkley, 899 F.2d 297, 299-301 (4th Cir.1990) (holding affiant’s omission of the fact that six eyewitnesses failed to identify a criminal suspect in a photo array did not satisfy the first Franks prong absent evidence that the affiant possessed “the requisite intent to mislead”). As in Simmons and Colkley, nothing in the omission alleged by the McFadyen plaintiffs plausibly suggests an intent to deceive or recklessness, and thus the asserted omission does not satisfy the first Franks prong.
2.
Because the plaintiffs have sufficiently pled that Officers Gottlieb and Himan deliberately made four false statements in the NTO supporting affidavits, we proceéd to Franks’ materiality prong. To state a Franks claim, false statements must be “material, that is, necessary to the neutral and disinterested magistrate’s” authorization of the search. Miller, 475 F.3d at 628 (internal quotation marks omitted); see also Franks, 438 U.S. at 171, 98 S.Ct. 2674; Colkley, 899 F.2d at 301. To determine materiality, we “excise the offending inaccuracies ... and then determine whether or not the corrected warrant affidavit would” provide adequate grounds for the search. Miller, 475 F.3d at 628 (internal quotation marks omitted).
In correcting the supporting affidavits, we remove the false statements regarding the broomstick, Mangum’s fingernails, and the suggestions that team members attempted to hide their identities, school, and team affiliations. Even so, the corrected affidavits clearly contain sufficient factual bases to establish both probable cause that a rape was committed and “reasonable grounds” that the named persons committed the rape, as required under the NTO statute.
As corrected, the affidavits: (1) describe Mangum’s allegation that, after dancing at the party, three white males “forcefully *652 held her legs and arms and raped and sexually assaulted her anally, vaginally, and orally;” (2) include the fact that police found some of Mangum’s belongings during their search of the house where the alleged rape was committed; and (3) contain Nurse Levicy’s corroborating statement that “the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.” A rape allegation, paired with corroborating medical evidence, undoubtedly establishes probable cause that a rape was committed. Cf. Torchinsky v. Simn-ski, 942 F.2d 257, 262 (4th Cir.1991).
The corrected affidavits also state “reasonable grounds” for belief that the named persons committed the rape. The corrected affidavits state Mangum’s allegations of gang-rape by three white men at the party; that the team captains had identified all but five of the white team members named in the NTO as being present at the party; that “no strangers ... showed up to the event”; and that — because there were so many attendees — all white members of the lacrosse team were listed under the NTO because “they were all aware of the party and could have been present.” These facts might not demonstrate probable cause, but certainly meet the NTO “reasonable grounds” standard. For these facts state more than an “unparticularized suspicion” that the parties named in the NTO may have raped Mangum. See State v. Pearson, 356 N.C. 22, 566 S.E.2d 50, 54 (2002) (stating that “reasonable grounds” requires only “a minimal amount of objective justification, something more than an ‘unparticularized suspicion or hunch,’ ” and is a “significantly lower” standard than probable cause).
Because the corrected NTO affidavits would provide adequate support for a magistrate’s authorization of the NTO, we cannot say that the false statements identified above were “material.” Therefore, we reverse the district court’s denial of defendants’ motions to dismiss these § 1983 unlawful seizure claims.
C.
Plaintiff Ryan McFadyen individually alleges a § 1983 claim against Officers Gott-lieb and Himan for the assertedly unlawful search and seizure of his apartment and car pursuant to a search warrant.[8] McFa-dyen alleges that the officers made material false statements and omissions in the search warrant application. The district court denied the officers’ motions to dismiss this claim, relying on its reasoning with respect to the NTO claims. Because McFadyen alleges that Officers Gottlieb and Himan made false statements or omissions material to the issuance of the search warrant, we again analyze the claim under Franks.
1.
The affidavit supporting the search warrant mirrors those supporting the NTO with the following two additions. First, the officers added that during the party “[t]he players ... used numbers when calling for one and another across the room[,] again to hide their identities.” Second, the officers added the contents of the email McFadyen sent to his teammates and the assertion by Officer Gottlieb that he received the email from a confidential source. McFadyen contends that both of these statements, like the four statements discussed above in the NTO affidavits, constitute knowing false statements under the *653 first Franks prong. We agree with respect to the first statement, as the record lends it no support.
But we disagree as to the second statement, which contains the email. McFa-dyen argues that, because the affidavit indicates that the email was provided by a “confidential source,” but does not articulate any facts relating to the reliability of the source, we must strike the email from the affidavit before addressing Franks’ materiality prong. Assuming, without deciding, that this would be the appropriate manner to handle such admittedly truthful, yet perhaps inadequately verified, information under Franks, we nonetheless find McFadyen’s argument meritless.
Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), on which McFadyen heavily relies, in fact provides him little support. J.L. holds that police officers must offer evidence other than an anonymous tip to support a Terry stop-and-frisk. Id. at 268, 120 S.Ct. 1375. In this case, the email itself supplies evidence in addition to the anonymous tip. For the email sent from McFadyen’s Duke email account and signed with his jersey number contains sufficient indicia of reliability to support its inclusion in the search warrant application. See United States v. Perkins, 363 F.3d 317, 325 (4th Cir.2004) (“The central point in those [anonymous tip] cases is that courts must ensure, one way or the other, that an anonymous informant’s tip was sufficiently reliable.”). Accordingly, we do not strike McFadyen’s email from the warrant affidavit.
2.
Because McFadyen sufficiently pled that Officers Gottlieb and Himan made five false statements in the search warrant affidavit (four from the NTO affidavits and the additional statement as to the players’ use of jersey numbers to hide their identities), we proceed to Franks’ materiality prong to “determine whether or not the ‘corrected’ warrant affidavit would establish probable cause.” Miller, 475 F.3d at 628 (internal quotation marks omitted).
“Probable cause exists when there is a fair probability that ... evidence of a crime will be found in a particular place.” United States v. Grubbs, 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (internal quotation marks omitted). We conclude that the corrected affidavit establishes probable cause to search McFadyen’s dorm room.[9]
As corrected, the affidavit still contains significant evidence that a rape was committed, most notably Mangum’s allegations and Nurse Levicy’s corroborating statement that “the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.” Further, the affidavit contains McFadyen’s email, which specifically identified his apartment as the location of a planned murder of exotic dancers.
Even crediting McFadyen’s allegation that his email spoofed the novel and film, American Psycho, a reasonable officer could have — and given the circumstances here, should have — taken seriously the email’s disturbing contents. McFadyen’s email, sent only hours after the alleged rape of an exotic dancer, specifically contemplated other brutally violent behavior toward exotic dancers. The email’s temporal proximity and substantive similarity to the rape allegations provide more than a fair probability that evidence relating to *654 the rape would be found in McFadyen’s apartment.[10]
McFadyen’s argument that the affidavit fails to establish a nexus between his apartment and the asserted crimes also fails. That none of the crimes stemming from Mangum’s allegations were alleged to have occurred in McFadyen’s apartment is irrelevant. Instead, the probable cause inquiry focuses on whether the affidavit demonstrates a “fair probability” that evidence relating to the crimes alleged would be found in McFadyen’s apartment. See Unus, 565 F.3d at 125 n. 25; see also Grubbs, 547 U.S. at 95, 126 S.Ct. 1494. Based on the content of McFadyen’s email, there is no question that the corrected affidavit meets this standard.
Because the corrected affidavit would provide adequate support for a magistrate’s finding of probable cause, we cannot say that the false statements in the affidavit were “material” under the second Franks prong. Therefore, we reverse the district court’s denial of defendants’ motions to dismiss McFadyen’s individual § 1983 unlawful search and seizure claim.
D.
Based on the above § 1983 claims, all three sets of plaintiffs allege derivative claims of supervisory liability against City supervisory officials and of liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), against the City itself.[11] Further, plaintiffs allege “stigma-plus” due process claims under Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), against various officials who had made public statements about the investigation. The district court denied the City and its officials’ motions to dismiss these claims.
All of these claims require a predicate constitutional violation to proceed. For “supervisors and municipalities cannot be liable under § 1983 without some predicate ‘constitutional injury at the hands of the individual [state] officer,’ at least in suits for damages.” Waybright v. Frederick Cnty., 528 F.3d 199, 203 (4th Cir.2008) (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)). Similarly, a plaintiff bringing a “stigma-plus” claim under Paul must allege both a stigmatic statement and a “state action that ‘distinctly altered or extinguished’ ” his legal status. Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 315 (4th Cir.2012) (quoting Paul, 424 U.S. at 711, 96 S.Ct. 1155). Because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers, we must also hold that all plaintiffs have failed to state supervisory liability, Monell liability, and “stigma-plus” claims.[12] *655 Thus, we reverse the district court’s denial of the defendants’ motions to dismiss these derivative claims.
III.
Having resolved the City and officials’ appeals of the district court’s denial of their motions to dismiss the federal claims asserted against them, we turn to their appeals of the district court’s denial of their motions for summary judgment or to dismiss the state law claims. Federal jurisdiction over the Evans and Carrington state law claims rests on diversity of citizenship. Although the MeFadyen plaintiffs only pled federal question jurisdiction, a federal court has pendent jurisdiction over their state law claims. 28 U.S.C. § 1367. Similarly, we have appellate jurisdiction under the collateral order doctrine to review a district court’s denial of those claims to which the defendants assert immunities “from suit.” Gray-Hopkins v. Prince George’s Cnty., 309 F.3d 224, 231 (4th Cir.2002); see also Moore v. Evans, 124 N.C.App. 35, 476 S.E.2d 415, 420 (1996).
A.
All three sets of plaintiffs allege state common-law tort claims against the City. The City moved for summary judgment as to these claims on the ground of governmental immunity from suit. The district court denied the motion.
Clearly, North Carolina municipalities enjoy governmental immunity from state common-law tort claims arising out of their performance of governmental, as opposed to proprietary, functions. Patrick v. Wake Cnty. Dep’t of Human Servs., 188 N.C.App. 592, 655 S.E.2d 920, 923 (2008). Just as clearly, the provision of police services constitutes a governmental function protected by governmental immunity. Arrington v. Martinez, 716 S.E.2d 410, 414 (N.C.Ct.App.2011).
All plaintiffs maintain, however, that the City has waived its governmental immunity by purchasing liability insurance pursuant to N.C. Gen.Stat. § 160A-485(a). Well-established North Carolina law holds that courts may not lightly infer a waiver of immunity. Guthrie v. N.C. State Ports Auth., 307 N.C. 522, 299 S.E.2d 618, 627 (1983). Indeed, “[i]mmunity is waived only to the extent that the city or town is indemnified by the insurance contract from liability for the acts alleged.” Combs v. Town, of Belhaven, 106 N.C.App. 71, 415 S.E.2d 91, 92 (1992). All plaintiffs argue that a genuine dispute of material fact exists as to whether the City waived its governmental immunity by purchasing liability insurance.[13]
Plaintiffs first contend that the City’s purchase of two liability insurance policies from the Insurance Company of the State of Pennsylvania (“ICOP”) waived its governmental immunity. But a “governmental immunity endorsement” present in both ICOP policies establishes that the City did not waive its governmental immunity. The endorsement states:
[T]his policy provides coverage only for occurrences or wrongful acts for which the defense of governmental immunity is clearly not applicable or for which, after *656 the defenses is [sic] asserted, a court of competent jurisdiction determines the defense of governmental immunity not to be applicable.
The endorsement is clear and none of the plaintiffs’ arguments undermine its clarity. Indeed, the endorsement is materially indistinguishable from similar provisions that North Carolina courts have held do preserve governmental immunity. See Owen v. Haywood Cnty., 205 N.C.App. 456, 697 S.E.2d 357, 359-60, review denied, 364 N.C. 615, 705 S.E.2d 361 (2010); Estate of Earley ex rel. Earley v. Haywood Cnty. Dep’t of Soc. Servs., 204 N.C.App. 338, 694 S.E.2d 405, 409 (2010); Patrick, 655 S.E.2d at 923-24. Thus, we must hold that the City did not waive its governmental immunity through the ICOP policies.
Nor do the plaintiffs’ contentions that the City waived its governmental immunity by purchasing an insurance policy from Everest Insurance Company fare any better. For none of the plaintiffs’ claims implicate the policy period covered by the Everest policy. That policy explicitly provides coverage for “occurrences” or “wrongful acts” for the policy period of April 1, 2007 to April 1, 2008. Plaintiffs do not allege any “occurrences” or “wrongful acts” during the Everest policy’s temporal scope.[14] Accordingly, the Everest policy does not apply to their claims and cannot function as a waiver of governmental immunity. See Patrick, 655 S.E.2d at 923.
Finally, the McFadyen plaintiffs argue that the City waived its governmental immunity by participating in a local government risk pool or creating a funded reserve under N.C. Gen.Stat. § 160A-485(a). Neither argument is persuasive. The asserted local government risk pool that the McFadyen plaintiffs identify is actually a contract for the provision of liability claims adjusting services, not a contract for the provision of liability coverage itself. Further, because the City repealed its funded reserve on June 18, 2007, the funded reserve does not waive the City’s governmental immunity in these cases.[15]
In short, no genuine dispute as to any material fact exists as to whether the City waived its governmental immunity from state common-law tort claims; it clearly did not. Accordingly, we reverse the district court’s denial of the City’s motion for summary judgment as to these claims.
B.
The plaintiffs also allege state common-law tort claims against various Durham police officers, to which the officers asserted official immunity. In North Carolina, official immunity protects public *657 officials performing discretionary acts under color of authority from suit in their individual capacity. See Moore, 476 S.E.2d at 421. Plaintiffs may avoid dismissal of such claims on official immunity grounds simply by pleading that an official’s tortious actions were “malicious, corrupt or outside the scope of [his] official duties.” Id. Notwithstanding the officers’ vigorous appellate arguments to the contrary, as the district court explained, the plaintiffs sufficiently pled malicious conduct by the officers.[16] Thus, we need only consider whether the alleged conduct fails as a matter of law to constitute a tortious act under North Carolina law.
1.
The Evans plaintiffs allege that Officers Addison, Gottlieb, and Himan engaged in the tort of malicious prosecution by concealing material evidence, manufacturing false evidence, and intimidating witnesses. The district court denied the officers’ motion to dismiss this claim on official immunity grounds, finding the plaintiffs properly pled the elements of a state malicious prosecution claim — causation of a criminal proceeding, without probable cause and with malice, which terminates in the plaintiffs favor. See Williams v. Kuppenheimer Mfg. Co., 105 N.C.App. 198, 412 S.E.2d 897, 899 (1992). On appeal, the officers urge us to hold — as we do in the § 1983 context — that Prosecutor Nifong’s decision to seek indictments against the Evans plaintiffs broke the causal chain between their acts and the indictments.
Certainly, no North Carolina court has adopted the attenuated view of causation espoused by the plaintiffs; but North Carolina courts have generally held causation can be established by allegations that the defendant “instituted, procured, or participated in” a criminal proceeding. See Moore v. City of Creedmoor, 120 N.C.App. 27, 460 S.E.2d 899, 906 (1995), aff'd in part, rev’d in part on other grounds, 345 N.C. 356, 481 S.E.2d 14 (1997); see also Becker v. Pierce, 168 N.C.App. 671, 608 S.E.2d 825, 829 (2005). Given this language, we cannot hold that the district court erred in finding that the Evans plaintiffs pled a state-law malicious prosecution claim as to Officers Gottlieb and Himan. However, plaintiffs fail to allege any conduct by Officer Addison that plausibly could be construed as “institut[ing], procuring], or participat[ing]” in a criminal proceeding. Accordingly, we must affirm the court’s denial of Officers Gottlieb and Himan’s motions to dismiss this claim, and reverse the court’s denial of Officer Addison’s motion to dismiss this claim.
2.
All three sets of plaintiffs allege state common-law obstruction of justice claims against Officers Gottlieb and Himan, based on the officers’ asserted fabrication and concealment of evidence and witness tam *658 pering. The McFadyen plaintiffs also allege a state common-law obstruction of justice claim against the officers’ supervisor, Commander Jeff Lamb, based on his asserted concealment of evidence and witness tampering.
All three officers argue that, in North Carolina, criminal suspects (like the plaintiffs) cannot allege a common-law obstruction of justice claim against police officers based on how the officers conducted a criminal investigation. Although logic would seem to compel this conclusion, the district court denied the defendants’ motions to dismiss, explaining it could not “rule out the possibility that a claim could exist for common law obstruction of justice for creation of false evidence or destruction of evidence for the purpose of impeding the justice system, even if the conduct occurred as part of a criminal investigation.” McFadyen v. Duke Univ., 786 F.Supp.2d 887, 975 (M.D.N.C.2011). We cannot affirm. Even though North Carolina courts have interpreted common-law obstruction of justice to include fabrication of evidence, Henry v. Deen, 310 N.C. 75, 310 S.E.2d 326, 334 (1984), and destruction of evidence, Grant v. High Point Reg’l Health Sys., 184 N.C.App. 250, 645 S.E.2d 851, 855 (2007), we have not found—and plaintiffs have not offered—any case from any jurisdiction recognizing a common-law obstruction of justice claim against a police officer for his actions relating to a criminal proceeding.
Thus, in forecasting whether North Carolina would recognize such an action, see Wilson v. Ford Motor Co., 656 F.2d 960, 960 (4th Cir.1981), we must conclude that although such a holding may be a remote “possibility,” it is not a reality. Accordingly, we reverse the district court’s denial of the officers’ motions to dismiss this claim.
C.
Finally, the City asks us to exercise pendent appellate jurisdiction over the district court’s denial of the City’s motions to dismiss all three sets of plaintiffs’ state constitutional claims.
Because governmental immunity does not shield North Carolina municipalities from claims alleged under the state constitution, Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 678 S.E.2d 351, 354 (2009), the district court’s denial of the City’s motion to dismiss is a non-final order, not appealable under the collateral order doctrine. Nonetheless, the City urges us to exercise pendent appellate jurisdiction over these claims because, it argues, the issue of governmental immunity is relevant to the existence of a state constitutional claim, and because the state constitutional standards are the same as those applicable to plaintiffs’ § 1983 claims.
As we have previously noted, “[p]endent appellate jurisdiction is an exception of limited and narrow application driven by considerations of need, rather than of efficiency.” Rux v. Republic of Sudan, 461 F.3d 461, 475 (4th Cir.2006). Our exercise of pendent appellate jurisdiction “is proper only when an issue is (1) inextricably intertwined with the decision of the lower court to deny qualified immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question.” Bellotte v. Edwards, 629 F.3d 415, 427 (4th Cir.2011) (internal quotation marks omitted). In this case, neither rationale is present. Our review of the issues of qualified, official, and governmental immunity in these appeals did not require any evaluation of the state constitutional claims. Indeed, the state constitutional claims, although “sharing certain wholesale commonalities” with the immunity issues, *659 “nevertheless present quite distinct factual and legal issues at the retail level” — in particular, what constitutes an “adequate remedy at state law” under Craig. Id.
We therefore decline to exercise pendent appellate jurisdiction over the state constitutional claims. Instead, we dismiss for lack of jurisdiction the City’s appeal of the district court’s denial of the City’s motions to dismiss these claims.
IV.
To recapitulate, we hold as follows. We reverse the district court’s denial of all defendants’ motions to dismiss the federal claims alleged against them. We reverse the court’s denial of the City’s motion for summary judgment as to the state common-law claims alleged against it. We affirm the court’s denial of Officers Gott-lieb and Himan’s motions to dismiss the state common-law malicious prosecution claims alleged against them. We reverse the court’s denial of the officers’ motions to dismiss all other state common-law claims. We dismiss for lack of appellate jurisdiction the City’s appeal of the state constitutional claims alleged against it. Finally, we remand the cases for further proceedings consistent with this opinion.

AFFIRMED IN PART, DISMISSED IN PART, REVERSED IN PART, AND REMANDED.

. We note that one or more of the three complaints also allege claims against the private laboratory, Duke University, and Duke employees, among others. None of these defendants asserted any immunity from suit, and thus none could file appeals from the district court's interlocutory rulings. All three complaints additionally allege numerous claims against the prosecutor, Michael Nifong. The district court held that Nifong did not enjoy qualified immunity from the claims alleged against him for his investigatory actions. Because Nifong did not note an appeal of that ruling, it is not before us.

. Based on the same facts, the Evans plaintiffs also allege a Fourteenth Amendment substantive due process claim against Officers Gottlieb and Himan. The district court, noting the "unsettled legal doctrines” surrounding due process claims based on asserted pretrial fabrication of evidence, nonetheless denied the officers' motions to dismiss this claim. In doing so, the court erred. The Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Rather, ”[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.” Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion) (internal quotation marks omitted); see also id. at 286-91, 114 S.Ct. 807 (Souter, J., concurring). Because the Fourth Amendment provides "an explicit textual source” for § 1983 malicious prosecution claims, the Fourteenth Amendment provides no alternative basis for those claims.

. In addition to contending that Nifong’s decisions to seek the indictments constitute intervening acts shielding them from liability, Officers Gottlieb and Himan contend that the grand jury's decisions to indict constitute similar intervening acts. Given our holding as to Nifong, we need not and do not reach this contention.

. In North Carolina, state district attorneys, like Nifong, have the sole discretion to decide whether to prosecute. See State v. Ward, 354 N.C. 231, 555 S.E.2d 251, 260 (2001) (citing N.C. Const. Art. IV § 18(1)).

. Twelve years ago, the Second Circuit questioned in dicta why "reasonable foreseeability” would not suffice to preserve the causal chain between a police officer’s actions and an unlawful seizure by way of indictment. See Zahrey, 221 F.3d at 351-52. However, no other court has pursued this suggestion and more recently the Second Circuit itself has stepped back from that broad dicta. See Wray, 490 F.3d at 195. As explained in text above, we believe good reasons counsel against following the approach suggested in the Zahrey dicta.

. Plaintiffs also challenge the constitutionality of the North Carolina NTO statute, contending that it authorizes searches and seizures of blood and DNA without probable cause. The district court correctly noted the uncertainty as to whether North Carolina courts would interpret the state NTO statute "as authorizing a search and seizure ... on less than a full showing of probable cause” and whether "such an interpretation would render the state NTO statutes unconstitutional.” McFa-dyen v. Duke Univ., 786 F.Supp.2d 887, 925 (M.D.N.C.2011); see also State v. Grooms, 353 N.C. 50, 540 S.E.2d 713, 728 (2000). Nonetheless, the district court refused to hold that the officers’ qualified immunity barred this claim. Given this uncertainty, we cannot conclude that clearly established law mandated "a full showing of probable cause” or that the state NTO statute would be held unconstitutional without such a showing. Accordingly, we must reverse the district court’s refusal to dismiss this constitutional challenge to the state NTO statute on qualified immunity grounds. However, it is clear that seizures pursuant to the NTO statute are "no less subject to the constraints of the Fourth Amendment,” and that the Constitution requires some evidentiary showing, even if not "probable cause in the traditional sense,” for the collection of DNA evidence pursuant to an NTO. See Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); see also Hayes v. Florida, 470 U.S. 811, 816-17, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). *650 On its face, the state NTO statute requires such an evidentiary showing. See N.C. Gen. Stat. § 15A — 273(1)—(3). We address in text plaintiffs’ arguments that NTO affidavits failed to provide the evidentiary showing required in the NTO statute.

. On appeal, plaintiffs insist that we look to their complaints as a whole to determine whether Officers Gottlieb and Himan alleged numerous other assertedly false statements in the NTO affidavits. We reject plaintiffs’ suggestion that defendants — and courts — should scour several-hundred page complaints to discover which affidavit statements plaintiffs allege are fabricated or misleading. A complaint must specify the facts plaintiffs allege defendants falsified or omitted. Contrary to plaintiffs’ arguments, general allegations that "every material fact" in the affidavits was fabricated do not suffice. See Franks, 438 U.S. at 171, 98 S.Ct. 2674 ("[Plaintiffs] should point out specifically the portion of the warrant affidavit that is claimed to be false.”).

. To the extent that McFadyen’s co-plaintiffs, Matthew Wilson and Bréele Archer, also attempt to bring this claim, we hold that they lack standing to do so. See United States v. Gray, 491 F.3d 138, 144 (4th Cir.2007).

. The search warrant also authorized the search of McFadyen’s car. On appeal, McFa-dyen maintains that a search of his car violated the Constitution. This argument fails because in his complaint McFadyen never alleges that police actually searched his car.

. McFadyen contends that the fact that the search warrant was executed nearly two weeks after he sent the email renders its information stale. While this may be true for the "conspiracy to commit murder” crime, the email certainly provided non-stale probable cause for the other crimes listed in the warrant application — sexual assault and kidnapping.

. We recognize that because cities do not possess qualified immunity from § 1983 claims, Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), we do not have appellate jurisdiction under the collateral order doctrine to hear the City's appeal of the Monell claims. However, because our determinations of the individual officers’ qualified immunities fully resolve the issue of the City’s Monell liability, we exercise pendent appellate jurisdiction over these claims. See Altman v. City of High Point, 330 F.3d 194, 207 n. 10 (4th Cir.2003).

.The parties dispute whether a Fourth Amendment violation constitutes a cognizable "plus” under Paul. Given that we hold that plaintiffs failed to state Fourth Amendment claims, we need not and do not reach this question.

. Plaintiffs briefly argue the City’s conflicting statements regarding its insurance coverage, along with its arbitration with one of its insurers over the policy coverage, bars the grant of summary judgment. However, because ”[t]he meaning of language used in an insurance contract is a question of law for the Court,” Daniel v. City of Morganton, 125 N.C.App. 47, 479 S.E.2d 263, 267 (1997), the City’s opinions and the existence and outcome of the arbitration proceedings are irrelevant to the purely legal question of whether the City waived its governmental immunity by purchasing liability insurance.

. Although the Evans and McFadyen plaintiffs allege an ongoing conspiracy among several defendants until April 11, 2007, the last specific ''occurrence” or "wrongful act” they allege occurred in December 2006. A plaintiff cannot defeat governmental immunity by alleging an ongoing conspiracy without any specific factual pleadings of a covered action during the policy period.

. Of course, all plaintiffs' tort claims against the City rest on conduct that occurred before the City repealed its funded reserve. However, when creating the funded reserve in 2004, ”[t]he City reserve[d] the right to modify or terminate th[e] policy at any time, and to have any such modification or termination apply to any claim not paid or for which there has not yet been a final decision of a court of competent jurisdiction.” Because the City repealed its funded reserve policy before a final decision in any of these cases — indeed, before plaintiffs even filed their original complaints — the City has not waived its governmental immunity as to these claims through its prior funded reserve. Moreover, because the City has not waived its governmental immunity, we need not reach the issue of whether the public duty doctrine immunizes the City from plaintiffs’ negligence-based tort claims.

. The partial dissent contends that there is an "obvious alternative explanation" for the officers’ allegedly malicious acts. See Ashcroft v. Iqbal, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). Maybe so if each act were viewed in isolation. But, in applying Iqbal, we are to "draw on [our] judicial experience and common sense” to determine whether plaintiffs’ well-pleaded, non-conclusory allegations collectively nudge the issue of malice "across the line from conceivable to plausible.” Id. at 679-80, 129 S.Ct. 1937. As outlined in the dissent itself, plaintiffs allege many wrongful acts by the officers. Taken together, the officers' multiple alleged acts certainly present plausible claims of malice. Of course, plaintiffs ultimately bear the burden of proving these allegations, and the district court may determine prior to trial that they have failed to offer evidence of a triable issue of fact as to the officers’ allegedly malicious conduct.